# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ALAN N. SCOTT,                                    :
                                                  :        Civil No. 09-0929 (RMB)
                    Petitioner,                   :
                                                  :               **OPINION**
          v.                                      :
                                                  :
FCI FAIRTON,                                      :
                                                  :
                    Respondent.                   :
                                                  :

**APPEARANCES:**
Alan N. Scott, Petitioner Pro Se, #17472-038
FCI Terre Haute
P.O. Box 33
Terre Haute, IN  47808

**Renée Marie Bumb,** United States District Judge:

This matter comes before the Court upon Petitioner's motion for reconsideration ("Motion") received by the Clerk on May 12, 2009.

On March 3, 2009, the Clerk received Petitioner's § 2241 petition ("Petition"), which was dated February 15, 2009.  See Docket Entry No. 1.  The Petition, executed in a virtually illegible hand script, allowed the Court to discern only that Petitioner's challenges were related, in one way or another, to the Residential Drug Abuse Treatment Program ("RDAP") administered at Petitioner's then-place-of-confinement, FCI Fairton, but did not allow the Court to determine any other aspects of Petitioner's challenges.  See id.  The Court, therefore, issued an order, dated April 24, 2009, dismissing the Petition without prejudice, for failure to comply with the requirements of Habeas Rule 2(c) and Local Rule 81.2, and directed the Clerk to remit the filing fee of $5.00 to Petitioner. See Docket Entry No. 2.

In addition, since the Petition did not assert that Petitioner's claims were duly exhausted administratively and included no attachments replicating the documents pertinent to administrative exhaustion of what might have been Petitioner's claims, the Court advised Petitioner of the applicable exhaustion requirement. See id. On April 27, 2009, the Clerk received Plaintiff's letter advising the Court of Plaintiff's relocation to his current place of confinement, FCI Terre Haute, that letter was dated April 21, 2009. See Docket Entry No. 3. On May 12, 2009, the Clerk received Plaintiff's instant Motion. See Docket Entry No. 4.

## I.      Petitioner's Instant Submission

The Motion, a fifteen-page document, consists of the following:

(1)      a brief-like part titled "Motion for Reconsideration" ("Brief");

(2)      a copy of the envelope used, apparently, by the Clerk, for unknown purposes;

(3)      a note to this Court informing the Court that Petitioner did not get any response after he wrote to the Clerk on two occasions (allegedly, on April 8, 2009, and then on another, unspecified date, these two alleged letters are referred to, collectively, as "Unspecified Letters") and asserting that copies of the Unspecified Letters are attached to the note but, in actuality, having no such Unspecified Letters included in the submission;[1] and

(4)      a copy of Petitioner's original Petition ("Amended Petition"), with a "translation" of Petitioner's hand scripted statements typed right above each line of that hand script; this document also includes a small amount of additional typed data. See id.

---

[1]  Moreover, the docket does not show any letters to the Clerk from Petitioner other than those identified in this Opinion. See generally, Docket.

A.      The Brief

The bulk of the Brief is dedicated to discussion of Petitioner's preference for having his legal submissions typed, his inability to access a typewriter during his placement in segregated confinement, his disappointment with not having responses from the Clerks to the Unspecified Letters, Petitioner's research of the judges in this District and his decision to write a "shot in the dark" letter to this Court,[2] Petitioner's intent to file an amended petition upon obtaining access to a typewriter, Petitioner's opinion that "legibility [is] a matter that is in the eyes of the beholder," Petitioner's belief that no remittance of filing fee could be executed by the Clerk, as well as his discussion of legal sources dealing with prejudicial dismissals of habeas petitions and civil complaints.[3] See id. at 1-5.

The only potentially relevant statement contained in the Brief is a reference to Petitioner's execution of some "BP-10 and BP-11 Administrative Remedy appeals."[4]  See id.  at 2.  This

---

[2] See also Docket Entry No. 5.

[3] The Court is not entirely clear as to the reason for Petitioner's discussion of the statutory and Federal Rules of Civil Procedure regimes applicable to civil rights complaints, since the nature of Petitioner's habeas challenges does not appear in dispute.

[4] Petitioner referenced his administrative appeals in order to assert that his administrative appeals were not dismissed for being handwritten.  See Docket Entry No. 4, at 2.  Petitioner's statement to that effect suggests that Petitioner confuses the issue of legibility with that of having his submissions typed.  A legal submission must be legible, see Docket Entry No. 2 (explaining the same to Petitioner), but it need not be typed.  In other words, a legible hand printed text, same a legible hand script, is sufficient.  See id.  Conversely, an illegible handwritten or typed submission is insufficient.  See, e.g., Cann v. Hayman, 07-cv-2416 (GEB) (D.N.J.), Docket Entry No. 2 (filed on August 29, 2007) (dismissing an illegible typed submission). Consequently, Petitioner's administrative submissions could not have been rejected if they were executed in a legible handwriting, but the fact that they were not rejected does not indicate that Petitioner's illegible submissions to this Court is sufficient.  Since Petitioner did not attach copies of his administrative appeals to his Motion or to his Petition, the Court cannot compare the quality of Petitioner's illegible Petition to the quality of Petitioner's administrative appeals in order to provide Petitioner with further guidance as to legibility.

reference suggests that Petitioner might have exhausted his administrative remedies with regard to his instant challenges.[5]

### B.    The Amended Petition

The Amended Petition, presenting – as noted – the original Petition with "translations" and a small amount of additional data entered, asserts that:

(1)    Petitioner had two indictments prosecuted against him at the United Stated District Court for the Eastern District of New York ("EDNY"), and these indictments were returned in 2006 and 2007, see Docket Entry No. 4, at 9 (providing the indices of these criminal matters);

(2)    Petitioner had three indictments prosecuted against him at the United Stated District Court for the District of Massachusetts ("DMASS"), and these indictments were returned in 1997, 1998 and 1999, see id. (providing the indices of these criminal matters);

(3)    Petitioner's guilty pleas in the EDNY resulted in two consecutive sentences, one of 32 months and another of 33 months, both imposed on April 29, 2008, and Petitioner is currently pursuing an appeal as to his conviction and/or sentences in EDNY,[6] see id. at 9-10;

(4)    the DMASS prosecutions also resulted in two consecutive sentences, one of 96 months (imposed on February 8, 2000) and another of 48 months, imposed on an unspecified date

---

[5]   However, since the Motion, same as the original Petition, does not provide any detail as to Petitioner's administrative proceedings and does not include any copies of Petitioner's administrative challenges or the responses Petitioner received from the warden of FCI Fairton, the Regional Director or the Central Inmate Appeals, this Court is still left to guess which RDAP challenges, if any, Petitioner exhausted administratively and, if such exhaustion took place, what were the reasons given to Petitioner by the Bureau of Prisons ("BOP") as the basis for denial of Petitioner's request.

[6]   In actuality, Petitioner's EDNY appeal was filed only in one EDNY action, and it was dismissed.  See United States v. Scott, 06-cr-00731 (JFB) (E.D.N.Y.), Docket Entry No. 100.

in April 2000, with the latter being reversed by the <u>United States v. Scott</u> ("<u>Scott-First</u>

<u>Circuit</u>"), 270 F.3d 30  (1st Cir. 2001).  <u>See</u> <u>id.</u>

Clarifying that his instant habeas challenges relate solely to his EDNY sentences, <u>see</u> <u>id.</u> at

13, Petitioner asserts the following facts:

> FCI Fairton warden has improperly denied placement in RDAP program despite substantial documentary evidence of substance abuse in the 1 yr. Period relevant to [P]etitioner's federal criminal conduct in the community. [E]vidence was submitted of marijuana in 1999 and heroin in 1993 to 1999.  Federal criminal conduct on [P]etitioner's cases was from 1994 to 1999.  Petitioner has no conviction for crimes of violence or firearms and is eligible for early release under 18 USC 3621(e).

<u>Id.</u> at 11.

The foregoing statement indicates that: (1) Petitioner raised his administrative challenges

only to the warden of his former correctional facility (rather than duly exhausted hisclaims at all

three levels of the BOP); (2) Petitioner is not challenging the "deni[al] of placement in DRAP" (in

the sense of denial of drug-abuse treatment) but rather the warden's decision that Petitioner does not

qualify for early release if he completes RDAP;[7] (3) Petitioner believes that he qualifies for the early

release incentive because he committed his criminal offenses during the time when he was abusing

controlled substances.

## II.     Relevant Procedural History

---

[7] Typically, the BOP's allows – and even strongly encourages – RDAP participation by inmates interested in the program, even if these inmates do not qualify for the early release incentive.

Pertinent information canbe obtained from <u>Scott-First Circuit</u>, the thoughtful and detailed decision of the United States Court of Appeals for the First Circuit cited by Petitioner in his Amended Petition.  In <u>Scott-First Circuit</u>, the First Circuit stated:

> Identity theft is said to be among this country's fastest growing crimes.  In the 1990's and earlier, Alan Scott, a former paralegal handy with documents, apparently enhanced his income through an extensive array of white collar crimes using the identities of others.  Those of his activities that took place in the late 1990's led to a series of indictments and three separate criminal cases against him [in DMASS], one case a year from 1997 to 1999; all three cases led to convictions. . . . We take the cases in chronological order.  In a 1997 case, Scott pled guilty to bank fraud . . . and to making and possessing a forged check . . . .  Scott took checks from a Boston law firm that had employed him as a legal assistant [and] deposited the checks, with forged endorsements, in bank accounts in Texas.[8]  For these crimes he received a combined sentence of 96 months . . . .  In a 1998 case, a jury convicted Scott of conspiring to make and of making false claims to an agency of the United States [after] Scott filed twenty false income tax returns with the IRS . . . seeking tax refunds in the names of at least twelve people . . . , and the intended loss to the government exceeded $ 80,000.00. For these crimes he received sentences of 96 months for the conspiracy and 60 months for the false returns, concurrent with each other and with the sentence imposed in the 1997 case . . . .  In a 1999 case, Scott also pled guilty to an additional and different bank fraud, . . . and to conspiring to commit that fraud . . . .  The scheme involved fraudulently obtaining bank automobile loans. For this crime he was sentenced to a 46 month sentence, consecutive to those for the earlier cases . . . .

<u>Scott</u>, 270 F.3d at 33.

Moreover, it appears that, until his sentencing in April of 2000, Petitioner was not held in physical custody of the BOP or any other correctional institution or a similarly restraining facility: rather, he was in home confinement.  <u>See</u> <u>id.</u> at 34, 37-38, 40, 53 ("At the time the checks were deposited, Scott was working at the firm and living in Massachusetts under supervised release," "In 1996, the IRS . . . became aware of the fraud and began an investigation. Details on the false returns

---

[8]  "Knowing that Scott had a criminal record, a partner of the firm wanted to give him an opportunity to get his life straight.  This brings to mind the adage that no good deed goes unpunished."  <u>Scott-First Circuit</u>, 270 F.3d at 34 ad n.1.

led agents to suspect Scott, whom they already knew from past investigations and who had a substantial criminal record. . . . As a result, IRS agents began surveillance of Scott in October 1997," "In 1999, under a conditional plea agreement, Scott pled guilty to [certain charges]"); accord United States v. Scott, 06-cr-00731 (JFB) (E.D.N.Y.), Docket Entry No. 76 (Petitioner's submission requesting downward adjustment on the grounds that, for 13 months prior to being turned to the BOP's custody on his DMASS sentences, Petitioner was in home confinement); United States v. Scott, 99-cr-10099 (WGY) (D. Mass), Docket Entries Nos. 73 and 75 (the court's order remanding Petitioner to the BOP custody either on April 5, 2000 or April 6, 2000).

Furthermore, it seems that Petitioner was, for a certain period of time, out of the BOP custody  after he was released from prison confinement ensuing from his DMASS sentences and until he was arrested on his EDNY charges.  See United States v. Scott, 06-cr-00731 (JFB) (E.D.N.Y.), Docket Entries Nos. 4, 7 and 9 (these docket entries suggest that, while the original arrest warrant against Petitioner on EDNY charges was returned on February 10, 2006, the order of detention was conclusively entered only on October 13, 2006, due to the court's initial dismissal of the criminal complaint on March 11, 2006).

Consequently, it appears that Petitioner's practice of abusing controlled substances, which – according to his Petition – took place from 1993 to 1999, went into remission during the period of his pre-trial home confinement on DMASS charges and did not re-surge during the interim period between his DMASS sentences and his detention of EDNY charges.  Even more importantly, a joint reading of Petitioner's submissions made with regard to his EDNY sentences and the judicial orders entered with regard to his DMASS sentences suggest the possibility of a scenario where Petitioner already participated in RDAP program (and had his DMASS sentences reduced by the BOP on the

grounds of Petitioner's completion of RDAP) on the basis of the drug abuse practice Petitioner had

from 1993 to 1999.  Indeed, with respect to his EDNY sentences, the execution of which is the sole

issue challenged in this action, Petitioner made applications to his sentencing EDNY judge

requesting (and then numerously re-requesting) a directive that Petitioner would be enrolled in

RDAP.  See United States v. Scott, 06-cr-00731 (JFB) (E.D.N.Y.), Docket Entries Nos. 39-4, 83 and

88; United States v. Scott, 07-cr-00304 (JFB) (E.D.N.Y.), Docket Entries Nos. 9-4, 38.  Petitioner's

sentencing judge, however, denied these applications stating as follows: "Request denied.  The Court

denies to order that the BOP is required to allow [Petitioner] to participate in the RDAP program.

Instead, as referred in the Judgment and as discussed at sentencing, it was a non-binding

recommendation by the Court."  United States v. Scott, 06-cr-00731 (JFB) (E.D.N.Y.), Docket Entry

No. 84; United States v. Scott, 07-cr-00304 (JFB) (E.D.N.Y.), Docket Entry No. 37.

## III.    Pleading Requirement

"Habeas corpus petitions must meet heightened pleading requirements."    McFarland v.

Scott, 512 U.S. 849, 856 (1994).  Habeas Rule 2(c) requires a § 2254 petition to "specify all the

grounds for relief available to the petitioner," "state the facts supporting each ground," "state the

relief requested," be printed, typewritten, or legibly handwritten, and be signed under penalty of

perjury.  28 U.S.C. § 2254 Rule 2(c).

Habeas Rule 4 requires the Court to sua sponte dismiss a § 2254 petition without ordering

a responsive pleading "[i]f it plainly appears from the petition and any attached exhibits that the

petitioner is not entitled to relief in the district court." 28 U.S.C. § 2254 Rule 4.  Thus, "[f]ederal

courts are authorized to dismiss summarily any habeas petition that appears legally insufficient on

its face."  McFarland, 512 U.S. at 856.  Dismissal without the filing of an answer or the State court

record has been found warranted when "it appears on the face of the petition that petitioner is not

entitled to relief." Siers v. Ryan, 773 F.2d 37, 45 (3d Cir. 1985), cert. denied, 490 U.S. 1025 (1989);

see also McFarland, 512 U.S. at 856; United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000)

(holding that vague and conclusory allegations contained in a petition may be disposed of summarily

without further investigation by the district court); United States v. Dawson, 857 F.2d 923, 928 (3d

Cir. 1988) (same).

> The Supreme Court explained the pleading requirements under the Habeas Rules as follows:

> Under Rule 8(a), applicable to ordinary civil proceedings, a complaint need only provide "fair notice of what the plaintiff's claim is, and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). Habeas Rule 2(c) is more demanding. It provides that the petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." See also Advisory Committee's note on subd. (c) of Habeas Corpus Rule 2, 28 U.S.C., p. 469 ("In the past, petitions have frequently contained mere conclusions of law, unsupported by any facts. [But] it is the relationship of the facts to the claim asserted that is important . . . ."); Advisory Committee's Note on Habeas Corpus Rule 4, 28 U.S.C., p. 471 ("'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error."  . . . A prime purpose of Rule 2(c)'s demand that habeas petitioners plead with particularity is to assist the district court in determining whether the State should be ordered to "show cause why the writ should not be granted").

Mayle v. Felix, 545 U.S. 644, 655 (2005).

> Thus, Petitioner cannot satisfy the pleading requirement by promising to eventually re-amend

his Amended Petition by a pleading which might assert his claims or facts.  See id., compare Docket

Entry No. 4, at 1-5 (informing the Court that Petitioner plans to eventually assert more facts in

support of his claims).  The Court, consequently, will rule on the Amended Petition as drafted.

## IV.    Exhaustion

> This Court already detailed to Petitioner the three-step Administrative Remedy Program,

which – unless Petitioner asserts grounds warranting excuse of exhaustion – must be utilized to

complete the exhaustion requirement *prior* to filing his habeas petition. See Docket Entry No. 2. There is no need to reiterate the same in this Opinion. Since Petitioner asserts that his RDAP claims were addressed only by the warden of FCI Fairton, but -- in spite of the Court's express statement that the Petition must be exhausted -- is silent as to whether the claims were presented to the Regional Director and the Central Inmate Appeals, it appears that the Petition is unexhausted and, thus, must be dismissed without prejudice to filing a duly exhausted application.

## V.     Failure to Allege a Violation of Petitioner's Rights

Furthermore, even if this Court were to hypothesize that Petitioner's one-sentence reference in his Brief to BP-10 and BP-11 forms: (1) indicates that Petitioner filed administrative appeals at all levels; and (2) these appeals actually raised the very challenges being presented in the Amended Petition, the allegations -- as stated in the Amended Petition -- do not amount to a cognizable claim.

### A.     RDAP Program

In 1990, Congress charged the BOP with making available "appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b).  To carry out that requirement, as part of the 1994 Violent Crime Control and Law Enforcement Act, Congress amended § 3621 to require the BOP, subject to the availability of appropriations, to provide residential substance abuse treatment for all "eligible" prisoners. See 18 U.S.C. § 3621(e)(1)(C).  An "eligible" prisoner is one who is "determined by the Bureau of Prisons to have a substance abuse problem," and who is "willing to participate in a residential substance abuse treatment program." 18 U.S.C. § 3621(e)(5)(B)(i) and (ii). As an incentive for successful completion of the residential treatment program, the period of time a prisoner convicted of a nonviolent offense remains in custody after successfully completing such

a treatment program may be reduced up to one year by the BOP.  See 18 U.S.C. § 3621(e)(2).  It

appears that the Section 3621(e)(2) reduction of sentence is the issue Petitioner is interested in.

The BOP has promulgated regulations at 28 C.F.R. § 550.56 to implement the statutory

requirement.  The regulation requires that "[t]he inmate must have a verifiable documented drug

abuse problem."  28 C.F.R. § 550.56(a)(1).  "The decision on placement is made by the drug abuse

treatment coordinator."  28 C.F.R. § 550.56(b).  The BOP application of this regulation is contained

in Program Statement 5330.10, which provides, in pertinent part:

> 5.4.1. Drug abuse program staff shall determine if the inmate has a substance abuse
> disorder by first conducting the Residential Drug Abuse Eligibility Interview
> followed by a review of all pertinent documents in the inmate's central file to
> corroborate self-reported information.  The inmate must meet the diagnostic criteria
> for substance abuse or dependence indicated in the Diagnostic and Statistical
> Manual of Mental Disorders, Fourth Edition.  This diagnostic impression must be
> reviewed and signed by a drug abuse treatment program coordinator.  Additionally,
> there must be verification in the Pre-sentence Investigation Report or other similar
> documents in the central file which supports the diagnosis. Any written
> documentation in the inmate's central file which indicates that the inmate used the
> same substance, for which a diagnosis of abuse or dependence was made via the
> interview, shall be accepted as verification of a drug abuse problem.

Program Statement 5330.10, Drug Abuse Programs Manual, Ch. 5, § 5.4.1.

The Diagnostic and Statistical manual of Mental Disorders, Fourth Edition ("DSM-IV"),

published by the American Psychiatric Association, defines Substance Abuse or Substance

Dependence as a cluster of certain listed symptoms in the same twelve-month period.  The first

twelve-month period following Dependence or Abuse is designated Early Remission.  However, the

specifiers of Early Remission do not apply if the individual is in a "controlled environment."

Examples of a "controlled environment" include "closely supervised and substance-free jails,

therapeutic communities, or locked hospital units."  DSM-IV at 175-183.

Consequently, the BOP has instituted a practice of: (1) reviewing the prisoner's history of substance abuse during the twelve-month period precedent entry into a "controlled environment"; and (2) examining the prisoner's central file to determine if documentation exists to support a claim of substance abuse or dependence during the twelve-month period immediately preceding the prisoner's incarceration.  If an inmate's documents reveal that, during the twelve-month period immediately preceding the inmate's incarceration (or placement in a substance-free jail, therapeutic community or locked hospital unit), the inmate went into remission in the sense that there was no record of substance abuse, the BOP denies the Section 3621(e)(2) reduction of sentence (although the inmate is typically allowed to participate in the locally-administered DRAP program).  For instance, if -- during the period of pre-trial release, that is, prior to the entry into qualifying "controlled environment" -- the inmate does not abuse controlled substances for the period of twelve months or longer because the inmate is released on bond and under supervision, during which he is subjected to random drug testing, the BOP does not deem such "constructive custody" a qualifying  "controlled environment" and, thus, does not allow Section 3621(e)(2) reduction of sentence.

In light of the standards set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the courts reviewing inmates' challenges to the BOP decisions denying Section 3621(e)(2) reduction of sentence to inmates who went into remission during "constructive custody" upheld the BOP's decisions reasoning as follows:

> First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as

> would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).  Even where the agency construction appears in an "interpretive" rule not subject to the "notice-and-comment" procedure of the Administrative Procedure Act, the agency's interpretive rule is entitled to "some deference" where it is a permissible construction of the governing statute.  Reno v. Koray, 515 U.S. 50, 61 (1995).  In Lopez v. Davis, 531 U.S. 230 (2001), the Supreme Court upheld a related BOP regulation interpreting the phrase "nonviolent offense" and categorically excluding certain types of prisoners from participation in the early-release program.

> Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so. In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the legislature's revealed design."

Lopez, 531 U.S. at 242 (citations omitted).  Similarly, here, Congress has not spoken to the precise question at issue but has left it to the discretion of the [BOP] to determine which prisoners "have a substance abuse problem."  The BOP reasonably has turned to the DSM-IV criteria to identify prisoners who have a substance abuse problem.  As the DSM-IV, in turn, dictates that diagnosis is dependent upon the existence of certain symptoms during a twelve-month period, and that remission is dependent upon the absence of those symptoms unless one is in a "controlled environment," it is reasonable for the BOP to evaluate the existence of those symptoms during the twelve-month period immediately preceding a prisoner's entrance into the controlled environment of long-term incarceration. . . . Thus, the challenged . . . practice of the BOP is a reasonable interpretation of the statute, as most courts agree. See, e.g., Rea v. Sniezek, 2007 U.S. Dist. LEXIS 7815  (N.D. Ohio Feb. 2, 2007); Shew v. F.C.I. Beckley, 2006 U.S. Dist. LEXIS 89475 (S.D.W. Va. Sept. 19, 2006); Montilla v. Nash, 2006 U.S. Dist. LEXIS 46647, 2006 WL 1806414 (D.N.J. June 28, 2006); Quintana v. Bauknecht, 2006 U.S. Dist. LEXIS 28707 (N.D. Fla. May 2, 2006); Goren v. Apker, 2006 U.S. Dist. LEXIS 22110 (S.D.N.Y. April 20, 2006); Laws v. Barron, 348 F. Supp. 2d 795 (E.D. Ky. 2004). . . . [I]n light of the DSM-IV definition of remission as excluding only those periods during which the individual is in a "controlled environment" such as "closely supervised and substance-free jails … or locked hospital units," it is not arbitrary and

capricious for the BOP to include remission behavior during periods of only limited supervision such as Petitioner's release on bail subject only to random drug testing.

Rosenfeld v. Samuels, 2008 U.S. Dist. LEXIS 23981, at *8-12 (D.N.J. Mar. 26, 2008).

### B.    Petitioner's Challenges Do Not State a Cognizable Claim

Here, Petitioner appears to assert that he should qualify for a Section 3621(e)(2) reduction of sentence because he was abusing controlled substances during the time when he committed some of his multiple criminal offenses.

Petitioner misreads both the language and the goal of Section 3621(e)(2): the provision was enacted not to offer a reward, in the form of reduced prison sentence, to those offenders who committed their criminal acts while abusing controlled substances but to offer a life-straightening opportunity to those persons who, upon their entry into a "controlled environment" suffer of the ill of drug abuse.   In other words, the sole purpose of Section 3621(e)(2) is rehabilitation of those individuals who suffer of drug abuse at the time -- or shortly prior to the time -- when they enter a "controlled environment:" this purpose is not related to the problem of substance abuse that the offenders might have had sometimes in the past but managed to conquer a year (or longer) prior to their entry in a "controlled environment."   See generally, Reuven Cohen, Treating and Releasing the Mule: the Rational, Non-discriminatory Provisions of 18 U.S.C.3621, 7 S. Cal. Interdis. L.J. 255 (1998) (discussing the history and legislative challenges of RDAP and noting that the final goal of RDAP focuses "on skills the inmate will need to handle and anticipate problems which may emerge upon reintegration to the community through a halfway house, home confinement, or directly into the general population").

Consequently, since it appears that Petitioner: (1) spent an unspecified period of time between his DMASS and EDNY sentences being outside prison and without suffering of the drug abuse problem (as his Amended Petition does not assert that Petitioner suffered of any drug abuse habit after 1999); (2) also spent three-months of his DMASS pre-trial home confinement in 2000 without suffering from the drug abuse problem; (3) in addition, in 1999, he spent the up-to-ten-month period without suffering from the drug abuse problem, while being in DMASS pre-trial home confinement; and (4) he does not assert that the BOP was presented with documented evidence of Petitioner's drug abuse during the twelve months preceding Petitioner's entry of the BOP custody, Petitioner's allegations do not state a cognizable claim.[9]    Plainly put, in order to state a cognizable claim, Petitioner must assert that he suffered from a verifiable drug abuse problem during the twelve consecutive non-controlled-environment months preceding his EDNY incarceration.  The Amended Petition, however, failed to so assert.  Therefore his Petition must be dismissed for failure to state a claim.  See Mayle v. Felix, 545 U.S. at 655.

Finally, the Court notes its utmost concern with the impression created by the totality of judicial orders and Petitioner's submissions entered in Petitioner's DMASS and EDNY criminal

---

[9]  The Court takes note of the circumstances of Petitioner's pre-trial home confinement of DMASS charges being mindful of the possibility that the unspecified period of time Petitioner spent outside "controlled environment" between his DMASS and EDNY sentences might be less that one year, for example, the period between confinements could have been nine months.  This example invites an inquiry as to whether the remaining three months of the twelve-month of the pre-controlled-environment period (analyses for the purposes of RDAP) should be deemed the last three months of Petitioner's pre-trial home confinement of DMASS charges.  This Court, therefore, for the purposes of this Opinion only, presumes that the circumstances of Petitioner's pre-trial home confinement of DMASS charges might be relevant.  However, in the event the Court revisits Petitioner's challenges, the Court expressly reserves its decision as to whether the "twelve-month pre-controlled-environment period" could be broken into two (or more) "sub-periods" as a result of an inmate's entry into controlled environment, followed by a less-than-twelve-month release and then by re-entry into controlled environment.

proceedings: the totality of these documents suggests that Petitioner was already availed to a

RDAP participation and corresponding Section 3621(e)(2) reduction of his DMASS sentences

on the grounds of Petitioner's drug abuse problem lasting from 1993 to 1999.  If so, it cannot be

an abuse of discretion on the part of the BOP to deny Petitioner another sentence reduction (as to

his EDNY sentences) since nothing in 18 U.S.C. § 3621 directs the BOP to use the very same

period of Petitioner's drug abuse habit as bases for multiple RDAP-based sentence reductions

truncating, anew, each successive sentence (or each successive set of sentences) Petitioner might

have during his/her lifetime.  See 18 U.S.C. § 3621.

**VI.    Conclusion**

   In light of the foregoing, Petitioner's Motion will be granted in the sense that the Court

considered Petitioner's submission.  See Pena-Ruiz v. Solorzano, 281 Fed. App'x 110, 111 n.1

(3d Cir. 2008) (clarifying that a district court's reconsideration of its previous decision qualifies

as a grant of motion for reconsideration if the reconsideration is conducted on merits, regardless

of whether or not the district court arrives, upon such reconsideration, at a conclusion identical to

that previously reached).

   The Amended Petition will be dismissed without prejudice, as unexhausted, for failure to

raise Petitioner's claims to all three levels of the BOP.

   Alternatively, in the event to all three levels of the BOP were presented with Petitioner's

allegations that he should be allowed reduction of his EDNY sentences on the grounds that his

criminal offenses were committed during the period when he was abusing controlled substances,

the Amended Petition will be dismissed, with prejudice, for failure to state a cognizable claim.[10]

------------------------

[10]   In the event Petitioner is not challenging denial of sentence reduction but merely seeks an opportunity to participate in the locally-administered RDAP for the purposes of getting treatment for his current medical condition, i.e., dependency on controlled substances, Petitioner shall seek enforcement of his rights to such treatment by filing a civil complaint.  Federal law provides two avenues of relief to prisoners: a petition for habeas corpus and a civil rights complaint.  See Muhammad v. Close, 540 U.S. 749, 750 (2004).  "Challenges to the validity of any confinement or to particulars *affecting its duration* are the province of habeas corpus . . . [while] requests for relief turning on *circumstances of confinement* [fall within the realm of] a § 1983 action."  Id.  (emphasis supplied).  The Court of Appeals for the Third Circuit explained the distinction between the availability of civil rights relief and the availability of habeas relief as follows:

> [W]henever the challenge ultimately attacks the "core of habeas" - the validity of the continued conviction or the fact or length of the sentence - a challenge, however denominated and regardless of the relief sought, must be brought by way of a habeas corpus petition.  Conversely, when the challenge is to a condition of confinement such that a finding in plaintiff's favor would not alter his sentence or undo his conviction, an action under § 1983 is appropriate.

Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002).

Therefore, a prisoner is entitled to a writ of habeas corpus only if he "seek[s] to invalidate the duration of [his] confinement - either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the [government's] custody."  See Wilkinson v. Dotson, 544 U.S. 74, 81 (2005).  In contrast, if a judgment in the prisoner's favor would not affect the fact or duration of the prisoner's incarceration, habeas relief is unavailable and a civil complaint is the appropriate form of remedy.  See, e.g., Ganim v. Federal Bureau of Prisons, 235 Fed. App. 882 (3d Cir. 2007) (holding that district court lacks jurisdiction under § 2241 to entertain prisoner's challenge to his transfer between federal prisons); Bronson v. Demming, 56 Fed. App. 551, 553-54 (3d Cir. 2002) (habeas relief was unavailable to inmate seeking release from disciplinary segregation to general population, and district court properly dismissed habeas petition without prejudice to any right to assert claims in properly filed civil rights complaint).

However, in view of Petitioner's status as <u>pro se</u> litigant,[11] this Court will allow Petitioner one final opportunity to re-amend his Amended Petition in the event:

(1)   Petitioner was not availed to a Section 3621(e)(2) reduction of sentence (based on Petitioner's alleged abuse of substances during the period from 1993 to 1999) with regard to his DMASS sentences; *and*

(2)   Petitioner was actually abusing controlled substances during his twelve-month-pre-controlled-environment period, assessed in light of Petitioner's entry of controlled environment in connection with his EDNY sentences; *and*

(3)   Petitioner requested RDAP participation and corresponding Section 3621(e)(2) reduction of his EDNY sentences from the BOP by duly presenting *these particular challenges* to all three levels of the BOP.   If, and only if, these three conditions are satisfied, Petitioner may re-state his claims to that effect in his re-amended petition.

While Petitioner is encouraged to attach copies of his submissions made during administrative review and responses he received from all three levels of the BOP, Petitioner need not make such submissions if he has no access to a copier or funds to copy: Petitioner's clear statements about his administrative exhaustion will be sufficient, and the Court will direct Respondent to provide the Court with the applicable administrative record.  Petitioner, however, is reminded to execute his re-amended petition, if such is submitted, in a legible handwriting.[12]

---

[11]   Although Petitioner's practice as paralegal and extensive litigation experience during his numerous criminal proceedings suggests Petitioner's sufficient familiarity with law, the Court finds it proper to assess Petitioner's submission with the degree of lenience applicable to <u>pro se</u> litigants.

[12]   If Petitioner is in doubt as to which handwriting is "legible in the eyes of the beholder," and he cannot type his re-amended petition, Petitioner is *strongly encouraged* to use a

The Clerk will be directed not to refund Petitioner's filing fee, or – if such filing fee is already refunded by the date of entry of the Order accompanying this Opinion – the Clerk will be directed to notify the Court accordingly, and the Court would order Petitioner to remit his filing fee or to submit his in forma pauperis application in connection with the instant matter.

An appropriate Order accompanies this Opinion.

s/Renée Marie Bumb

**RENÉE MARIE BUMB**
**United States District Judge**

Dated: May 22, 2009

_____

print-style mode of handwriting rather than script.