**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALAN N. SCOTT, | : | Civil No. 09-0929 (RMB) |
| Petitioner, | : | |
| v. | : | **MEMORANDUM OPINION** |
| FCI FAIRTON, | : | |
| Respondent. | : | |

This matter comes before the Court upon Petitioner's submission of his second amended petition ("Second Amended Petition"), see Docket Entry No. 8, and it appearing that:

1.  On March 3, 2009, the Clerk received Petitioner's original § 2241 petition ("Original Petition"), which was dated February 15, 2009.  See Docket Entry No. 1.  The Petition, executed in a virtually illegible hand script, allowed the Court to discern only that Petitioner's challenges were related, in one way or another, to the Residential Drug Abuse Treatment Program ("RDAP") administered at Petitioner's then-place-of-confinement, FCI Fairton, but did not allow the Court to determine any other aspects of Petitioner's challenges.  See id.  The Court, therefore, issued an order, dated April 24, 2009 ("April Order"), dismissing the Petition without prejudice, for failure to comply with the requirements of Habeas Rule 2© and Local Rule 81.2, and directed the Clerk to remit the filing fee of $5.00 to Petitioner.[1]  See Docket Entry No. 2.

---

[1] In addition, since the Petition did not assert that Petitioner's claims were duly exhausted administratively and included no attachments replicating the documents pertinent to administrative exhaustion of what might have been Petitioner's claims, the Court explained to Petitioner the applicable exhaustion requirement.  See id.

2.  On April 27, 2009, the Clerk received Petitioner's letter advising the Court of Petitioner's relocation to his current place of confinement, FCI Terre Haute. That letter was dated April 21, 2009. See Docket Entry No. 3.

3.  On May 12, 2009, the Clerk received Petitioner's motion ("Motion") seeking reconsideration of this Court's April Order. See Docket Entry No. 4.

4.  On May 22, 2009, this Court issued an order and accompanying opinion ("April Opinion") dismissing the First Amended Petition. See Docket Entries Nos. 6 and 7. While the points addressed in the Court's April Opinion need not be reiterated herein, the key points were as follows: Petitioner had two indictments returned against him in 2006 and 2007 and prosecuted in the Eastern District of New York ("EDNY"), plus three indictments returned in 1997, 1998 and 1999, and prosecuted in the District of Massachusetts ("DMASS"). As a result of these five criminal actions, Petitioner had two EDNY and two DMASS sentences imposed upon him, and Petitioner's instant action was challenging the execution of his EDNY sentences. See Docket Entry No. 6, at 4-5. Petitioner alleges that the warden of FCI Fairton improperly denied Petitioner enrollment in Fairton's Residential Drug Abuse Treatment Program ("RDAP") in the sense that the warden deemed Petitioner ineligible for a up-to-one-year reduction-of-sentence incentive associated with the program, although Petitioner was not prevented from participation in any program educating inmates about drug-abuse and assisting them in conquering their addiction. See id. at 5. As detailed by the United States Court of Appeals for the First Circuit (cited by Petitioner in his First Amended Petition), namely, United States v. Scott ("Scott-First Circuit"), 270 F.3d 30 (1st Cir. 2001), until his sentencing in April of 2000, Petitioner was not held in physical custody of the BOP or any other correctional institution or a similarly restraining facility: rather, he was in home confinement.

Moreover, it appeared that Petitioner was, for a certain period of time, out of BOP custody after he was released from prison confinement ensuing from his DMASS sentences and until he was arrested on his EDNY charges. Consequently, it appeared that Petitioner's practice of abusing controlled substances, which – according to his First Amended Petition – took place from 1993 to 1999, went into remission during the period of his pre-trial home confinement on DMASS charges and did not re-surge during the interim period between his DMASS sentences and his detention of EDNY charges("Interim Period"), that is, if such Interim Period actually took place. See Docket Entry No. 6, at 6-8. The Court noted that the First Amended Petition appeared unexhausted, see id., and, in addition, facially meritless in light of the RDAP rationale, goals and requirements. See id.. at 10-14. The Court concluded that Petitioner's allegations, even if deemed duly exhausted, did not seem to state a claim because: (I) Petitioner appears to concede that, during the 12 months preceding his joint DMASS and EDNY incarcerations, Petitioner was in home confinement, during which he did not use or abuse illegal controlled substances; or (ii) Petitioner appears to concede that, during the Interim Period between his DMASS and EDNY incarcerations, Petitioner was in home confinement, during which he did not use or abuse illegal controlled substances; or (iii) Petitioner appears to concede that, during the total period of 12 months consisting of Petitioner's home confinement (prior to his entry in the BOP's custody on DMASS sentences) plus his Interim Period (between his DMASS and EDNY incarcerations), Petitioner did not use or abuse illegal controlled substances.[2]

---

[2] The Court reserved its decision as to whether the 12-month pre-custody period assessed for the purposes of the RDAP could consist of two or more parts in the event the litigant had a less-than-twelve-month interim period between incarcerations. See Docket Entry No. 6, at 15, n.9.

The Court, in detail, explained to Petitioner to the issue of whether or not Petitioner was abusing illegal controlled substances during commission of his crimes was irrelevant for the purposes of the RDAP analysis: what mattered was only the issue of whether Petitioner was abusing illegal controlled substances during the last twelve months prior to his entry to a controlled-environment (resulting from a government officials' custody, which -- in Petitioner's case -- means the custody of the BOP). See id. at 10-16. The Court, therefore, granted Petitioner leave to file a second amended petition if, and only if: (I) Petitioner was not availed to a Section 3621(e)(2) reduction of sentence (based on Petitioner's alleged abuse of substances during the period from 1993 to 1999) with regard to his DMASS sentences; *and* (ii) Petitioner was actually abusing controlled substances during his twelve-month-pre-controlled-environment period; *and* (iii) Petitioner requested RDAP participation and corresponding Section 3621(e)(2) reduction of his EDNY sentences from the BOP by duly presenting *these particular challenges* to all three levels of the BOP. See id. at 18.

5. On June 26, 2009, Petitioner filed his Second Amended Petition. See Docket Entry No. 8. The Second Amended Petition suggests claims falling into two categories: one asserting a multitude of claims against the BOP officials employed at the FCI Fairton, while the other category consists of numerous claims against the BOP's officials employed at the FCI Terre Haute. The former category includes claims asserting lack of equal protection (through allowing other prisoners, whose circumstances Petitioner equates to his own, participation in the Fairton's RDAP), allegedly undue tampering with -- and delay in delivery of -- Petitioner's legal mail, allegedly improper placement of Petitioner in segregated confinement, as well as delayed release from such segregated confinement, alleged conspiracy to transfer Petitioner to the FCI Terre Haute, alleged improper monitoring of Petitioner's phone privileges, alleged delay in delivery and/or loss of Petitioner's

property, alleged obstruction of Petitioner's access to courts, alleged failure to respond to Petitioner's grievances, delayed issuance of Petitioner's infraction notices, and so on and on. See id. at 15-25. The latter category, that is, allegations as to the actions of the BOP officials at the FCI Terre Haute, seem to challenge the conditions of confinements at that facility. See id. at 26-27. Collectively, all these allegations state various civil rights challenges. As the Court already explained to Petitioner, see Docket Entry No. 6, at 17, n. 10, none of these challenges can be raised in this habeas matter. These allegations, in the event Petitioner wishes to pursue them, must be raised through the means of filing civil complaint(s), pursuant to the holding of Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971).[3]

---

[3] The Court stresses that it expresses no opinion as to the validity of Petitioner's civil allegations raised in the Second Amended Petition. Moreover, the Court finds it useful, at this juncture, to inform Petitioner that the Clerk will not file a civil rights complaint unless the person seeking relief pays the entire applicable filing fee in advance or the person applies for and is granted in forma pauperis, status pursuant to 28 U.S.C. § 1915. See Local Civil R. 5.1(f). The filing fee for a civil rights complaint is $350.00. See 28 U.S.C. § 1914(a). If a prisoner seeks permission to file a civil rights complaint in forma pauperis, the Prison Litigation Reform Act ("PLRA") requires the prisoner to file a complete application. See 28 U.S.C. § 1915(a)(2). The PLRA further provides that, if the prisoner is granted permission to file the complaint in forma pauperis, then the Court is required to assess the $350.00 filing fee against the prisoner and collect the fee by directing the agency having custody of the prisoner to deduct installment payments from the prisoner's prison account. In addition, the PLRA further provides that, if a prisoner has, on three or more occasions while incarcerated, brought an action or appeal in a federal court that was dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from immune defendants, then the prisoner may not bring another action in forma pauperis unless (s)he is in imminent danger of serious physical injury. See 28 U.S.C. § 1915(g). Finally, the Court finds it useful to notify Petitioner about the working of Rules 18 and 20. Rule 20(a)(2) of the Federal Rules of Civil Procedure limits the joinder of defendants, and Rule 18(a) governs the joinder of claims. See Fed. R. Civ. P. 18(a), 20(a)(2). Wright & Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder

6. As to the issue, with regard to which the Court granted Petitioner leave to amend, Petitioner's allegations present, effectively, a motion for reconsideration. Although extremely voluminous, the Second Amended Petition does not provide the Court with either: (a) the dates of Petitioner's filings of his grievances with the warden of the FCI Fairton, the Regional Office and the Central Office; or (b) copies of -- or even mere summaries of Petitioner's allegations stated in -- Petitioner's grievances filed with the warden, the Regional Office and the Central Office. Hence, the Court is left to guess

---

> of claims, which is governed by Rule 18.  Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18 . . .  Despite the broad language of Rule 18(a), [Petitioner] may join multiple defendants in a single action only if [Petitioner] asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all . . .

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure Civil 3d §1655; see also Ross v. Meagan, 638 F. 2d 646, 650 n.5 (3d Cir. 1981), overruled on other grounds by, Neitzke v. Williams, 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied). Consequently, a civil Petitioner may not name more than one defendant in his complaint unless one claim against each additional defendant is transactionally related to the claim against the first defendant and involves a common question of law or fact.  See Fed. R. Civ. P. 20(a)(2).  As the United States Court of Appeals for the Seventh Circuit recently explained:

> multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2.  Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the required filing fees - for the [PLRA] limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees.  28 U.S.C. § 1915(g) . . .  A buckshot complaint that would be rejected if filed by a free person - say, a suit complaining that A defrauded the [Petitioner], B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions - should be rejected if filed by a prisoner.

George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007).  Consequently, the Court -- without ruling -- notes its skepticism as to whether Petitioner's civil claims against the Terre Haute officials could be raised in the same complaint as his civil rights allegations against the Fairton officials, and as to whether all his Fairton-related civil claims could be raised in the single complaint.

whether: (a) the Central Office actually failed to respond to Petitioner in a fashion allowing for conclusion that the Central Office denied Petitioner's appeal; (b) whether such presumptive denial took place prior to February 15, 2009, that is, the date of Petitioner's execution of his Original Petition, and thus the Original Petition could be deemed exhausted; and © whether Petitioner actually raised the same challenges to all three levels of the BOP.  See generally, Docket Entry No. 8.

7.  Presuming, for the purposes of this Memorandum Opinion only, all the aforesaid ambiguities should be resolved in the way most favorable to Petitioner, the Court assumes that the Central Office's "denial-by-failure to respond" took place prior to February 15, 2009, and that Petitioner raised to the Central Office: (a) the claim that he asserted to the Regional Office, i.e., that he was abusing controlled substances until February of 1998; and (b) in addition, alleged that his entry in a "controlled environment" took place when he began his bail-based home confinement.  This Court reaches the very same conclusion that the Court reached in its April Opinion: the BOP's decision to deny Petitioner the RDAP-based incentive reduction of his sentence was not an unreasonable application of the agency's mandate.

8. It appears that the discrepancies between the rationale articulated by the warden and the Regional Office / Central Office[4] cannot qualify Petitioner for relief: as long as the conclusion reached by the warden was in line with that of the Regional Office / Central Office, and the decision issued by the

---

[4] Presumptively accepting Petitioner's position that the Central Office implicitly affirmed the position of the Regional Office, the Court, therefore, reads the rationale utilized by the Regional Office (i.e., that Petitioner was not abusing controlled substances during the twelve months preceding his entry in the BOP custody and, therefore, cannot qualify for the RDAP-based reduction of Petitioner's sentences) as the rationale underlying the Central Office's implicit affirmance of the Regional Office's decision.

Regional Office / Central Office stated the official position of the BOP, the Court's mandate is limited to assessment of the (un)reasonableness of the BOP's final decision, here, the (un)reasonableness of the position taken by the Regional Office / Central Office.[5]

9. The position taken by the Regional Office / Central Office appears to be clear: since Petitioner was in home confinement during the almost-thirteen months preceding his incarceration and -- during that period -- he was not abusing, or even using, any controlled substances, Petitioner does not qualify for RDAP-based incentive reduction of sentence. This position is consistent with the conclusion reached by the Court in its April Opinion: because Petitioner's home confinement was not a "controlled environment," such as a closely-supervised-and-substance-free jail or a locked hospital unit, it was not unreasonable for the BOP to conclude that Petitioner's drug addiction went into voluntary remission during Petitioner's thirteen months of home confinement, hence allowing the BOP to deny Petitioner's RDAP-based incentive reduction of his chain of sentences. See Docket Entry No. 6, at 10-19. As expressed in his Second Amended Petition, Petitioner's position could be reduced to an assertion that Petitioner's home confinement was "controlled enough" to qualify as a

---

[5] Petitioner's disappointment with being "wrongfully guided" by the prison official at the FCI Fairton (who, allegedly, informed Petitioner that RDAP-based incentive is available to those inmates who assert that they committed their crimes -- or were arrested -- during the time when they abused controlled substances) is disingenuous, at best. While the Second Amended Petition makes is apparent that Petitioner: (a) was willing to allege to the warden any set of facts qualifying him for RDAP-based reduction of sentence; and (b) felt "tricked" by alleging, upon the aforesaid guidance, the set of facts which proved to be insufficient under the correct legal standard, Petitioner's disappointment with this alleged "shifting sands trickery" does not help Petitioner's cause: his RDAP-based request had to be based on the *actual facts* rather than on his willingness to assert whatever set of facts the BOP would approve. Cf. In re Ins. Brokerage Antitrust Litig., 2007 U.S. Dist. LEXIS 73220, at *49 (D.N.J. Sept. 28, 2007) ("plaintiff has to allege an actual [set of facts] rather than to express willingness to assert whatever [facts] the court approves") (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790 n.5 (3d Cir. 1984), cert. denied, 469 U.S. 1211, 105 S. Ct. 1179, 84 L. Ed. 2d 327 (1985)).

"controlled environment" for the purposes of RDAP, because Petitioner had no roommates, was rarely outside his home, was -- officially -- meeting very few persons, plus had unannounced inspections of his residence and frequent drug testing. The obvious import of Petitioner's contention is that: (a) Petitioner wanted to use illegally controlled substances but did not so simply because the environment he was in prevented him from any meaningful opportunities ; (b) as such, his withdrawal from drug abuse during the home confinement was wholly involuntary; © which, in turn, means that no genuine remission of Petitioner's drug addiction took place during the thirteen months of his home confinement; and (d) therefore, the period for the purposes of RDAP should be the twelve-month period preceding Petitioner's home confinement, i.e., the period with regard to which Petitioner has certain evidentiary record suggesting drug usage.  This Court disagrees.  The environment of closely-supervised jail (or a locked hospital unit) qualitatively differs from that of home confinement.  In a jail, the inmates and visitors are channeled, upon entry, through metal detectors and subjected to pat-searches and, often -- if not always -- through strip searches. All items delivered to jails, be they food, prison clothing, toiletries, cleaning supplies, fixture, mail, packages from visitors, etc. are thoroughly searched. All public facilities are thoroughly searched, and the facilities themselves, as well as the cells of inmates, are made of materials -- and contain limited furnishing -- rendering the process of concealment of contraband relatively complex. Moreover, the facilities, inmates and visitors are occasionally subjected to searches with canines trained to locate controlled substances, and inmates (cooperating with prison officials by agreeing to become informants) enable monitoring of those prison activities that take place during odd hours and/or in odd parts of prison facility.  The home confinement described by Petitioner does not rise to this level. In sum, while Petitioner might have felt inconvenienced by the circumstances of his home

confinement, that environment cannot be equated with the environments of a closely-supervised jail or a locked hospital unit.

11.  Here, the question for the Court is whether the BOP's determination was not unreasonable. See Chevron, 467 U.S. at 843; Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided the BOP has acted rationally, the Court may not substitute its judgment for the agency's interpretation.  See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also IPSCO, Inc. v. United States, 965 F.2d 1056, 1061 (Fed. Cir. 1992). In light of the foregoing discussion, the Court finds that it was not unreasonable the Regional Office / Central Office of the BOP drew the a distinction between the controlled environment of closely-supervised jails/prisons/locked hospital units and the home confinement experienced by Petitioner.  Therefore, it was not unreasonable for the BOP to conclude that Petitioner voluntarily withdrew from abuse of controlled substances during the thirteen months preceding his incarceration and, hence, was not qualified for RDAP-based reduction of his chain of sentences.

12.  Here, the habeas aspect of Petitioner's Second Amended Petition states nothing but Petitioner's disagreement with the Court's conclusion as to the reasonableness of: (a) the distinction drawn by the BOP between the controlled environment of closely-supervised jails/prisons/locked hospital units and the home confinement experienced by Petitioner; and (b) the BOP's conclusion that Petitioner's non-use of controlled substances during his home confinement allowed the BOP to disqualify Petitioner from RDAP-based reduction of sentence.  This disagreement does not warrant reconsideration of this Court's prior decision.

13.  Accordingly, for the above reasons, Petitioner's Second Amended Petition will be dismissed. Specifically:  (a) Petitioner's challenges to denial of RDAP-based incentive reduction of his chain of sentences is dismissed: (I) with prejudice, as to Petitioner's claims -- be they duly exhausted or not -- asserting that Petitioner was abusing controlled substances *prior* to his thirteen-month home confinement, that preceded his entry in the BOP's custody; (ii) without prejudice, as to Petitioner's claims, which Petitioner might wish to raise (provided that such claims are supported by actual facts) asserting that Petitioner has evidentiary proof of his abuse of controlled substances *during* his thirteen-month home confinement, and also provided that such claims are duly exhausted by Petitioner administratively, and such exhaustion is executed prior to Petitioner's filing of his new § 2241 petition;[6]  (b) Petitioner's Bivens challenges are dismissed without prejudice to Petitioner's filing of appropriate civil action(s), in accordance with the guidance provided to him in the April Opinion and this Memorandum Opinion;[7] and, finally © because the Court cannot establish with

---

[6] Petitioner's potential reluctance to assert the fact of -- and disclose evidence showing -- his abuse of controlled substances *during* his thirteen-month home confinement (presumably, in violation of his then-existing bail order) is of no consequence to the RDAP-based inquiry.  In McKune v. Lile, 536 U.S. 24 (2002), the United States Supreme Court held that the Fifth Amendment right against compelled self-incrimination is not violated by a prison abuse treatment program that requires the inmates to provide details of all prior activities, regardless of whether such activities constitute uncharged criminal offenses.

[7] The Court, however, takes this opportunity to remind Petitioner about the consequences of abusing the writ.  "When a prisoner files multiple petitions for habeas corpus relief, the abuse of the writ doctrine as set forth in 28 U.S.C. § 2244(a) may bar his claims."  Furnari v. U.S. Parole Commission, 125 Fed. App'x 435, 2005 WL 535390, *20-21 (3d Cir. 2005) (relying on Sanders v. United States, 373 U.S. 1, 9 (1963)).  The concept of "abuse of. the writ" is founded on the equitable nature of habeas corpus. . . . Where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or engages in other conduct that disentitles him to the relief he seeks, the federal court may dismiss the subsequent petition on the ground that the prisoner has abused the writ.  See Sanders, 373 U.S. 1 at 15-17.  Thus, the Court strongly urges Petitioner to cease his practicing of raising his civil rights challenges in habeas petitions.

absolute certainty, that Petitioner's voluminous Second Amended Petition did not seek to raise, merely by mentioning in a cursory fashion, certain habeas challenges different from Petitioner's challenges set forth in his Original and First Amended Petitions (which were asserting improper denial of RDAP-based incentive reduction of his chain of sentences), such potentially intended different challenges are dismissed without prejudice to Petitioner filing an appropriate habeas petition, upon due administrative exhaustion of these challenges.

      An appropriate Order accompanied this Memorandum Opinion.

          S/Renée Marie Bumb
          **RENÉE MARIE BUMB**
          **United States District Judge**

Dated: July 16, 2009